**COMER et al.**

v.

**SMITH'S TRANSFER CORP. OF STAUNTON, VA., et al.**

No. 6743.

United States Court of Appeals, Fourth Circuit.

Argued March 19, 1954.

Decided April 5, 1954.

Fletcher W. Mann, Beckley, W. Va., for appellants.

Samuel D. Lopinsky, Charleston, W. Va. (Jackson D. Altizer, Charleston, W. Va., on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

On October 5, 1951 at 9 o'clock in the morning, a collision between a tractor-trailer and a Ford car, traveling in opposite directions three miles west of Covington, Virginia, resulted in the death of two and the permanent injury of two other members of the Comer family who occupied the passenger car. Four separate actions were brought against the owner and against the driver of the truck and were consolidated for trial. They were submitted to a jury who found a verdict for the defendants. The questions on this appeal relate to requests for instructions denied by the District Judge and to disparaging and discrediting remarks by the judge in his charge concerning the testimony of the most important witness produced on behalf of the plaintiffs.

On the day in question, the Comer family, consisting of Ira Comer, Lola Comer, his wife, Bettie Jane Comer, his 26 year old daughter, and Virginia Mrinzo, his wife's sister, left Charleston, West Virginia in the early morning in the Ford car for a vacation in North Carolina. When the accident occurred Ira Comer was driving, with his daughter beside him in the front seat, while the oth-

er women sat in the rear seat, Mrs. Mrinzo to the right. Comer and his daughter were killed. Mrs. Comer suffered permanent and total injuries and Virginia Mrinzo was severely and permanently injured.

Immediately before the accident the Comers were traveling east on Route 60, a road with a macadam surface 23 feet wide, and they were approaching a highway bridge spanning the tracks of the C. & O. Railway. Going in their direction, the road takes a considerable upgrade and a very sharp turn to the right just before reaching the bridge. At this moment the loaded tractor-trailer, traveling west, had just crossed the bridge and as it was rounding the curve to its left and descending the grade, the collision occurred.

William Farren, the driver of the truck, testified that he did not see the Ford car until it was only 20 to 25 feet away. His view ahead was unobstructed for a long distance but he had just passed another car as he was leaving the bridge and was going down grade and rounding one side of the curve, and was keeping his eyes on the right side of the road. He said that he was traveling 25 to 35 miles an hour and that the Comer car was going at 50 miles an hour and that the cars came together on his side of the road, and no part of his vehicle crossed the center of the road until after the collision. A skid mark in the road, seemingly made by the front wheel of the tractor-trailer, tended to show that his vehicle was some ten inches to the right of the center of the road at the moment of the collision unless the mark was made when the driver, noticing that he was heading across the center line, applied his brakes but was unable to stop the truck before it crossed the center of the road and came in contact with the other car. After the accident both *cars* came to rest on the extreme south edge of the road, that is, on the Ford side of the highway, and the Ford car had been forced around so as to face the direction from which it had come.

Testimony on behalf of the plaintiffs indicated that the Comer car was traveling about 35 miles per hour, and that the collision occurred three or four feet from the center line on its side of the road. Two of the occupants of the Ford car were dead. Mrs. Comer was so badly injured that she could give no account of the catastrophe. Virginia Mrinzo admitted that she did not see the actual impact but was certain that the Ford was keeping on the right side of the road. C. K. Bonham, the only independent eye witness to the collision, testified that he was following the Ford car at a distance of 50 to 75 feet in his own car as he was journeying to Charlottesville to bring his wife home from the hospital. He said that the collision occurred when the tractor-trailer went across the center line of the road for a distance of three or four feet into the path of the Comer car.

■ The conflicting testimony required the submission of the case to the jury. The judge, however, restricted the jury to the single issue as to which of the drivers went on the wrong side of the road, and withdrew from the jury the question of contributory negligence. Accordingly he refused an instruction offered by the plaintiff that negligence on the part of the driver of the Ford car could not be imputed to the other occupants of the car, and that if their injuries were caused by the negligence of both drivers of the passing vehicles, the plaintiffs were entitled to recover from the owner and driver of the truck.

■ We think that this ruling was wrong. It is true that in this case as in many other collision cases the accounts given by the opposing litigants were in sharp conflict, and that it was impossible to adopt one story without rejecting the other. The jury, however, was not obliged to take either course. It might have believed so much of the evidence of each of the parties as indicated that the other was in fault, and have found that both vehicles in rounding the sharp curve on a substantial grade inadvertently cut across the center line of the road so that the left front of one car came into con-

tact with the left front of the other. The jury might well have found from a consideration of the character of the road at the point of collision, the swiftness and unexpectedness of the collision, and the fact that the attention of none of the witnesses was confined solely to the movement of the two cars, that the testimony of none of the witnesses should be accepted *in toto*. It follows that the refusal of permission to the jury to consider this aspect of the case was erroneous and prejudicial to the plaintiffs, and therefore the judgment adverse to the occupants of the Ford car other than the driver must be reversed. See Luck v. Rice, 182 Va. 373, 29 S.E.2d 238; Sample v. Spencer, 222 N.C. 580, 24 S.E.2d 241; Murray v. Smithson, 187 Va. 759, 48 S.E.2d 239; Hamilton v. Southern Ry. Co., 4 Cir., 162 F.2d 884; Ransone v. Pankey, 189 Va. 200, 52 S.E. 2d 97; Frampton v. Consolidated Bus Lines, 134 W.Va. 815, 62 S.E.2d 126; Baltimore & Ohio R. Co. v. Green, 4 Cir., 136 F.2d 88.

The judgments for the defendants as to all of the plaintiffs must also be reversed on account of disparaging and argumentative comments by the judge in his charge with respect to the testimony of C. K. Bonham, the most important witness for the plaintiffs. Bonham is a man of 52 years of age, the father of a family of eight children, who resides with his wife at Ghent, Raleigh County, Virginia. He is engaged in the business of truck mining. On the day of the accident he left his home about 7 A.M. in his automobile for Charlottesville, Virginia, 210 miles distant, which he hoped to reach by 11 A.M. in order to bring his wife home from the hospital. The distance from his home to the scene of the accident was stated by him to be 100 to 125 miles, or perhaps not over 90 miles. During the argument on this appeal it was stated by plaintiffs' counsel without contradiction that the distance was 85 miles. It is of importance only in this case in that defendants, in an attempt to show that Bonham did not see the accident, contended that it was impossible for him to reach the scene of the accident at 9 A.M. when the crash occurred.

Bonham gave a circumstantial account of the details of the collision. For a half mile immediately before the accident he had been driving behind the Comer car at a distance of 50 to 75 feet, at the rate of 35 to 40 miles per hour. He noticed another car ahead of the Comer car which passed the truck as it was coming off the bridge; and he saw the truck round the curve and swing over the center line three or four feet in front of the Comer vehicle and collide with it and turn it completely around so that both vehicles came to rest on the Comer side of the highway. He managed to get his car off to the side of the road in time to prevent a collision with the wreck. The front door of the Ford car flew open as it stopped and Bettie Comer fell out and he and two other men who came up carried her to the roadside and laid her on the ground. He also helped Mrs. Mrinzo out of the car and noticed that she had lost a finger and that her teeth had been knocked out. He also helped to take Mrs. Comer and her dead husband out of the vehicle. He saw the ambulance come and give first aid to the injured and remove the bodies. He gathered up a number of small articles from the roadway which belonged to the plaintiffs including a radio and a pocketbook, and hung them on the side of the Ford car. Later he found that they had been placed in the ambulance.

Then after the ambulances had left and he started to resume his journey to get his wife, he noticed a little wallet on the ground and put it in his pocket, and did not open it until some hours later. He then found that it contained the name of Bettie Comer and some money, and not knowing that she had died, sent the wallet and the contents by insured mail to the hospital. This circumstance led the Comer relatives to seek him out and also led to the employment of the attorney for the plaintiffs whom he suggested or recommended. He had had no previous acquaintance with the Comers or their relatives.

Since Bonham was the only eye witness other than the truck driver, it was to be expected that he would be closely examined. This was done for the admitted purpose of showing that he was not present at the time of the accident and that his story was false and perjured. Certain points in his testimony were brought out and strongly emphasized to this end, including the impossibility of driving 100 miles in two hours. It was also noted that Bonham did not recognize in the court room at the trial the state police who came to the scene and that they did not recognize him as one in the crowd that quickly assembled; that he did not give his name as an eye witness to the officers who arrived before he left; that he carried away the small wallet unopened and did not turn it over to the officers; that he testified that the tractor-trailer driver produced a camera and took pictures although the truck driver said he had no camera; and that while freely talking with an investigator on behalf of the plaintiffs he refused to give the details of the accident to an agent of the defendants.

All of these circumstances were legitimate subjects for criticism and argument by the defendants in estimating the value of Bonham's testimony and might well have been the subject of comment by the judge in his charge. But the judge went much further. He told the jury that anything he might say about the facts of the case was not binding upon them, and that they were free to disregard his comments in passing upon the facts. He then assembled the facts bearing on Bonham's testimony in argumentative form and stated them to the jury in a manner which clearly indicated his opinion that Bonham was a perjured witness. In his charge he said:

"Now with reference to Mr. Bonham: I think you ought to consider a number of things about his testimony. One rather important fact is the timing. He said that he left home at 7:00 o'clock. He said that he traveled between 100 and 120 miles, and was an eye witness to this accident which happened at 9:00 o'clock, or a few minutes thereafter. Obviously, in going over the road that he said he went over, he couldn't make 50 miles an hour on that road all the time, which you would have to make to travel 100 miles in two hours, or 60 miles if he traveled 120 miles. It wasn't proved exactly how far that is, and we have no way of knowing from the evidence just how far it is from Ghent to where this accident happened; but he said between 100 and 120 miles, as I recall. We do know that a part of this is over a very mountainous territory, where a person couldn't make anything like 50 or 60 miles an hour. Now it is not important as to how fast this man traveled. That isn't the question. The question is, 'Is he telling you the truth when he says he was an eye witness? Was he there when the accident happened?' And it is material for you to consider whether he could get there, leaving his home at 7:00 o'clock and the accident happening a few minutes after 9:00.

"Well, he told a story about this truck driver that sounded very peculiar to say the least. He said that while he, Bonham, was down trying to help the injured people in the car and to get the people who were killed out, just a very short time after the crash occurred, that this truck driver was standing there taking pictures of him with a camera. Now that wasn't gone into very far; but the truck driver said he didn't even have a camera; and it is a very strange sort of conduct for any man who just had this kind of an accident to just grab his camera and jump out and, instead of helping the people, begin to take pictures. The jury may believe that that occurred, but they are entitled to think about the unreasonableness of it in determining whether they think it did occur or not.

"Then he said that he was, I think he said about 50 to 80 feet behind the Comer car and going about the same rate of speed. Mrs. Comer testified that was 35 miles an hour; said she was looking at the speedometer. Others said it was a greater rate of speed than that, but at 35 miles an hour, the car would

have traveled 50 feet in a second, so evidently if what Mr. Bonham says to you is true, the crash occurred at a time when Mr. Bonham was going at least 35 miles an hour. Now it is true that when you put your foot on the brake your car immediately slows down; but the question in your mind would be 'Could a man who was going 35 or 40 miles an hour and having 60 to 80 feet in which to stop, stop his car in that distance and pull off to the side without becoming himself involved in the accident?'

"He told you, too, that he was around there for a long time. The State Police were there. The State Police who were questioned about it said they didn't see him, to their best recollection. They said of course that they were not sure whether they would remember him or not, if they had seen him; but he tells about helping to get Mr. Comer out of the car; tells about helping to get the women who were hurt out of the car; and yet nobody remembers him being there or helping with any of that. That is another matter for you to consider.

"He tells something about pocketbooks. He hung them up, as I recall his testimony. He hung these pocketbooks up, and then later he said to a State Policeman 'Where are these pocketbooks? They are not here,' and the State Policeman told him they had been properly disposed of. Now you will remember Mr. Bryant's testimony about those pocketbooks. Mr. Bryant, who was a member of the Rescue Squad, said he found these pocketbooks in the car, not 'hung up;' that he wasn't sure just how he found them, but he was reasonably sure that they were either on the floor or on the seat. It seems to me that if he had found them hanging up he would have remembered that, but he didn't; and he turned them over to the State Policeman. He knows nothing about Mr. Bonham, and didn't see Mr. Bonham.

"Mr. Bonham found a wallet there and he just picked it up and put it in his pocket, with a crowd of people there. That doesn't have anything to do with the accident, of course; and he might have seen all that he says he saw, and yet he might have done that; but it is a rather strange thing for a person in a crowd to find a wallet, and instead of asking something about it, knowing the State Police were right there, just to stick it into his pocket and go on off with it. Now it is true that he later returned this wallet, and so far as the evidence shows he returned it intact, with everything in it, to the person to whom it belonged; but the fact remains that it was a somewhat peculiar act on the part of Mr. Bonham. There is no question that Mr. Bonham was there at some time. If he hadn't been there, he couldn't have got this wallet and later returned it. So he was there. The question is: 'Did he see what he said he saw?'

"One other bit of testimony of Mr. Bonham that was inconsistent with some other testimony; and that was that when he recommended Counsel to Mrs Lane that he told her about four different lawyers up at Beckley and named them; said one of them was Floyd Harless—no, Floyd Sayre, he said one them was either Mr. Harless or Mr. Sanders, I forget which, Mr. Harless I believe; and he said that another one was Mr. Locke. Now all these people are lawyers in Beckley, as well as Mr. Mann; but when Mrs. Lane testified she said that he didn't mention any of these other lawyers to her except Mr. Mann; so that is another inconsistency.

"It is true that this case depends for recovery on the part of the plaintiffs almost entirely on whether you believe or don't believe Mr. Bonham. That is why I have spoken so at length with reference to his testimony."

■ In contrast with these adverse comments upon Bonham's testimony there was no comment from the judge upon the fact that Bonham was a family man engaged in a lawful occupation who actually passed the scene of the accident on the morning that it occurred for legitimate family reasons. Nor was it mentioned that he had had no previous acquaintance with the plaintiffs or interest in the outcome of the case but was

brought into the case in the natural course of events. Obviously it was for the jury to give such weight as it saw fit to Bonham's testimony, taking into account the acts of commission or omission on his part which they may have deemed unlikely for a normal man to perform, and to appraise his testimony on the basis of all of the evidence; but before they had a chance to confer they were given the unmistakable impression that the judge did not believe what the witness had said.

█ It is not easy for a federal judge always to sound the right note in the performance of the responsible duty to array the facts and contentions of the conflicting parties so as to simplify the issues and aid the jury in reaching their determination. The rules which he must follow, however, have been frequently stated. In Quercia v. United States, 289 U.S. 466, 469, 470, 53 S.Ct. 698, 77 L.Ed. 1321, the court said:

"In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. Herron v. Southern Pacific Co., 283 U.S. 91, 95, 51 S.Ct. 383, 75 L.Ed. 857. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he things important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. * * *

"This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be onesided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.' "

See also, Virginia Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 405, 4 A.L.R.2d 1064.

In our opinion the charge in the pending case exceeded the permissible limits. The judgments must therefore be reversed and the case remanded for a new trial.

Reversed and remanded.