MONTGOMERY COCA–COLA
BOTTLING COMPANY,
INCORPORATED

v.

The UNITED STATES.

No. 275–73.

United States Court of Claims.

Feb. 20, 1980.

M. Roland Nachman, Jr., Montgomery, Ala., attorney of record, for plaintiff; Steiner, Crum & Baker, Montgomery, Ala., of counsel.

Jay G. Philpott, Jr., Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and BENNETT, Judges.

## OPINION

KASHIWA, Judge:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Wood, which was filed December 13, 1978, pursuant to Rule 134(h). We must decide whether the trial judge was correct in finding plaintiff intended to receive no payment for its franchise and, as a result, was not a personal holding company under I.R.C. §§ 541 et seq.[1] After considering the written submissions of the parties and their oral presentations, we reject the trial judge's recommended decision and hold for the defendant.

## FACTS

Plaintiff is an Alabama corporation, organized in 1934, with its principal place of

---

1. All statutory references are to the Internal Revenue Code of 1954, except as otherwise noted.

business in Montgomery, Alabama. During the years in issue, fiscal years ending September 30, 1965, through September 30, 1969, all of plaintiff's outstanding stock was held by two shareholders: the W. A. Bellingrath Trust (55 percent) and the Mary E. Bellingrath Trust (45 percent). These two shareholders plus income beneficiaries of the two trusts were the partners in two separate partnerships named the Coca-Cola Bottling Company of Montgomery (Montgomery partnership) and the Coca-Cola Bottling Company of Andalusia (Andalusia partnership).[2] Plaintiff entered into a subbottling contract with these partnerships.

By way of background, a first-line Coca-Cola bottler is one to which The Coca-Cola Company[3] has granted the exclusive right to bottle and sell Coca-Cola and to use the trademark name "Coca-Cola" within a prescribed geographic territory. This is what is referred to as the "franchise."

Prior to 1934, W. A. Bellingrath, now deceased, obtained by contract with The Coca-Cola Company the exclusive franchise for his territory.[4] In consideration for the rights granted him, Bellingrath agreed to purchase all Coca-Cola syrup from The Coca-Cola Company and to pay $1.30 for each gallon purchased.

On its formation in 1934, plaintiff received Bellingrath's rights to the franchise. In addition, plaintiff received real estate, a bottling plant, machinery, and fixtures. Since its inception, plaintiff never operated as an active bottling company. Rather, it leased its tangible assets and sublicensed its franchise right to bottle and sell Coca-Cola to its affiliated partnerships.

During the period 1941 through 1961, plaintiff and its two affiliated partnerships were run by one man, S. E. Elmore (Elmore). Elmore conducted the business of plaintiff and the partnerships without active participation of the stockholders or the partners.

Due to rapid changes occurring within the industry in the 1950's, Elmore was faced with a problem of acquiring enough cash to meet expected needs for new equipment. After consultation with H. J. Pratt, a partner in Ernst & Ernst, certified public accountants, which has represented the parties since 1941 or 1942, and with Paul Johnston, an attorney, a plan to obtain the needed cash was devised. The plan involved a sale of any tangible assets owned by the partnerships to the plaintiff (with plaintiff borrowing the necessary cash to finance the acquisition) followed by a lease back to the partnerships of all the assets held by the plaintiff.

On October 1, 1958, Elmore caused plaintiff to enter into sub-bottler's contracts with the Montgomery and Andalusia partnerships. Pursuant to these contracts, plaintiff conveyed its exclusive rights to bottle and sell Coca-Cola and to use the Coca-Cola trademark for a period of 10 years and 3 months. This period was later extended through December 31, 1970. In consideration therefor, the partnerships agreed to purchase all Coca-Cola syrup from plaintiff and to pay $1.50 for each gallon of syrup. The partnerships also agreed that the price per gallon would be increased to reflect any increase in the price plaintiff had to pay The Coca-Cola Company.

Each lease agreement further provided that the partnerships would pay annually (in addition to the payments specified in the sub-bottler's contracts) a sum equal to the aggregate of the amounts determined by the following formulae:

2. The Montgomery partnership and the Andalusia partnership are organized identically as follows: W. A. Bellingrath Trust (17.5 percent interest); Mary E. Bellingrath Trust (45 percent interest); Mrs. Elmore B. Bartlett (12.5 percent interest); Mrs. Jean B. Lane (12.5 percent interest); Mrs. Suzanne B. Von Gal (12.5 percent interest). Mrs. Bartlett, Mrs. Lane, and Mrs. Von Gal are the daughters of W. A. Bellingrath and Mary E. Bellingrath and are income beneficiaries of the W. A. Bellingrath Trust and the Mary E. Bellingrath Trust.

3. The Coca-Cola Company is the parent bottler, unrelated to plaintiff.

4. W. A. Bellingrath was granted this right around the beginning of the 20th century.

(1) 3⅓ percent of the gross cost to plaintiff of land and buildings as of the beginning of each taxable year;

(2) 10 percent of the gross cost to plaintiff of the bottling machinery and equipment as of the beginning of each taxable year;

(3) 130 percent of the aggregate annual depreciation deductions claimed by plaintiff for federal income tax purposes on account of automobiles, delivery equipment, and coolers.

In theory, during the years in issue plaintiff purchased Coca-Cola syrup from The Coca-Cola Company at a price of $1.30 per gallon. In turn, the partnerships purchased the syrup from plaintiff at a price of $1.50 per gallon. In practice, however, the partnerships were invoiced directly by The Coca-Cola Company and the partnerships paid to plaintiff the difference: 20 cents per gallon.

On audit, the Internal Revenue Service (Service) determined that the plaintiff was a personal holding company during the years in issue and assessed the plaintiff under section 541. The Service considered plaintiff to have received personal holding company income (as defined in section 543(a)(6))[5] in excess of 60 percent of its "adjusted ordinary gross income" (as defined in section 543(b)(2)). This was based on the Commissioner's finding that the entire 20 cents per gallon payment was a payment for the partnerships' use of plaintiff's Coca-Cola franchise and was therefore a royalty. As such, the 10 percent "test" of the second sentence of section 543(a)(6) is satisfied and all the income described in section 543(a)(6) is counted as personal holding company income for purposes of sections 541 and 542. Any amount over approximately 6 cents per gallon is the "break point" at which, under section 543(a)(6), the income is classified as personal holding company income.

Plaintiff paid the assessed deficiencies[6] and asserted claims for refund. In each claim for refund the plaintiff posed alternative arguments. Either all the income from the partnerships was "compensation for the use of property" and, thus, not includible in the 10 percent test of section 543(a)(6); or the value of the franchise was such that there either were no payments for its use or they were so small that, together with the plaintiff's other personal holding company income, the amount was not 10 percent of plaintiff's ordinary gross income (i. e., under the break point). As such, the payments for the use of shareholder-owned property were not personal holding company income. Section 543(a)(6).

This case has twice been before this court on motions for summary judgment. By order of February 28, 1975, 206 Ct.Cl. 864 (1975), we held that "royalties" as classified in section 543(a)(1), and defined in Treas. Reg. § 1.543–1(b)(3), include "amounts received for the privilege of using patents, copyrights, secret processes and formulae, goodwill, trademarks, trade brands, franchises, and other like property." Additionally, we held that to the extent any payments under the sub-bottler's contracts and leases are royalties as within the meaning of section 543(a)(1) and Treas.Reg. § 1.543–1(b)(3), they are personal holding company

5. We are concerned with section 543(a)(6), as amended by Pub.L.No.88–272, § 225(d), effective with respect to taxable years beginning after December 31, 1963. Section 543(a)(6) reads as follows:

"(6) USE OF CORPORATION PROPERTY BY SHAREHOLDER.—Amounts received as compensation (however designated and from whomsoever received) for the use of, or right to use, property of the corporation in any case where, at any time during the taxable year, 25 percent or more in value of the outstanding stock of the corporation is owned, directly or indirectly, by or for an individual entitled to the use of the property; whether such right is obtained directly from the corporation or by means of a sublease or other arrangement. This paragraph shall apply only to a corporation which has personal holding company income for the taxable year (computed without regard to this paragraph and paragraph (2), and computed by including as personal holding company income copyright royalties and the adjusted income from mineral, oil, and gas royalties) in excess of 10 percent of its ordinary gross income."

6. The assessed deficiencies total $458,859.56 plus interest.

income for purposes of the 10 percent test of section 543(a)(6).[7] In our order we also held that "[i]t is apparent that some part of the gallonage payments made under the sub-bottler's contracts was in exchange for plaintiff's franchise rights." 206 Ct.Cl. at 866. Further, we remanded the case to the trial judge, ordering him to determine whether "the amount of gallonage payments that are properly allocable or attributable to the use of plaintiff's franchise was five cents per gallon or twenty cents per gallon; * * *."[8] *Id.*

Defendant filed another motion for summary judgment, requesting a determination of the amount of the royalty based on the documents before the court, relying on *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). This motion was denied because plaintiff did not expressly set out the 20 cents per gallon as a "royalty" and, therefore, was not bound under the *Danielson* rule *as a matter of law* to 20 cents per gallon as a royalty. 208 Ct.Cl. 950 (1975).

The trial judge ruled that the 20 cents per gallon payment from the partnerships to plaintiff "was intended solely as a partial payment to plaintiff for the use of plaintiff's tangible assets by the respective partnerships, not as a payment to plaintiff for the use by the respective partnerships of plaintiff's franchise." The trial judge thus found the proper amount of the gallonage payment attributable to the use of plaintiff's franchise was neither 5 nor 20 cents but, rather, zero. As a result, plaintiff had no personal holding company income under section 543(a)(6) and was not a personal holding company.

### I. *Appellate Review*

In this review of the trial judge's report, we take note of our Rule 147(b) and case law which state that the findings of fact made by the trial judge are presumptively correct. *Commerce International Co. v. United States*, 338 F.2d 81, 167 Ct.Cl. 529 (1964); *Davis v. United States*, 164 Ct.Cl. 612 (1964).

While we agree the report of a trial judge is entitled to much consideration, that does not impair nor dilute our duty of bearing the ultimate responsibility for determining matters before us. If we are convinced that the preponderance of the evidence goes against the determination of the trial judge, we are obliged to so hold. *Bringwald v. United States*, 334 F.2d 639, 643, 167 Ct.Cl. 341, 347 (1964); *Miller v. United States*, 339 F.2d 661, 662, 168 Ct.Cl. 498, 501 (1964); *Willett v. United States*, 406 F.2d 1346, 1353, 186 Ct.Cl. 775, 787–788 (1969); *Hebah v. United States*, 456 F.2d 696, 710, 197 Ct.Cl. 729, 753 (1972) (dissenting opinion of Davis, J.). The presumption of correctness may be applied less stringently to documentary evidence. With documentary evidence the trial judge is in no special position to rule on the credibility or applicability of such evidence; as such, our review of findings based on documentary evidence may be more severe. *See Morris v. United States*, 171 Ct.Cl. 220, 228 n. 4 (1965).

Also, once the Commissioner of Internal Revenue makes an assessment against a taxpayer, a presumption of correctness attaches to that determination. *Cf. Lykes Bros. Steamship Co. v. United States*, 459 F.2d 1393, 1400, 198 Ct.Cl. 312, 325 (1972) (the court in discussing burden of proof discusses how a presumption of correctness attaches to the Commissioner's determination). The burden unquestionably rests on the taxpayer to disprove the Commissioner's findings. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212

---

7. Our order of February 28, 1975, 206 Ct.Cl. 864 (1975), resolved the issue against plaintiff as to whether a payment for the use of the franchise was "compensation for the use of property" (or "rent") and therefore excluded from the computation of the 10 percent test of section 543(a)(6). As such, we need not concern ourselves with that issue in this opinion.

8. In note 2 of finding of fact number 2, the trial judge interprets the holding of our order of February 28, 1975, as an order for the trial judge to determine "the amount, *if any*, 'allocable to the franchise right * * *.'" [Emphasis supplied.] This is too narrow a reading of our order.

(1933); *E. I. du Pont de Nemours and Co. v. United States*, 221 Ct.Cl. ——, 608 F.2d 445 (1979). It is equally clear that it is the duty of the judges of this court to determine if the taxpayer's burden has been satisfied. *Bringwald v. United States, supra.* Where we find, contrary to the trial judge's report, that the greater weight of the evidence discloses that taxpayer's burden has not been met, this court must substitute its own findings for that of the trial judge. *Willett v. United States, supra; Miller v. United States, supra.*

For reasons which will be discussed *infra*, we are satisfied that we must substitute our own findings for those of the trial judge.

II. *Review of the Trial Judge's Report*

Since 1934 a special tax has been imposed on so-called "personal holding companies." Currently, section 541 imposes a special tax at the rate of 70 percent of the undistributed personal holding company income of a corporation. This tax, since it does not turn on need, reasonableness, or the purpose of the accumulation, operates as an automatic obstacle [9] to corporate accumulations in avoidance of the progressive individual tax on the shareholders.[10] The tax is applied, instead, if certain objective conditions are met. These conditions can be reduced to two primary tests. First, the stock must be closely held, which means five or fewer individuals must own more than 50 percent of the stock. Section 542(a)(2). This includes constructively owned stock as set out in section 544(a). Second, the corporate income must be specifically enumerated passive income from investments and not operating income, which means 60 percent or more of the corporation's "adjusted ordinary gross income" (defined in section 543(b)(2)) must be "personal holding compa-

ny income" (defined in section 543). Section 542(a)(1). *See* S. S. Surrey, W. C. Warren, *Federal Income Taxation* (1973 ed.), Vol. II, 389 (Surrey & Warren).

As noted above, the Commissioner determined plaintiff was a personal holding company. We must now determine whether the trial judge was correct in his finding that the plaintiff satisfactorily carried its burden and sufficiently proved that it received approximately less than 6 cents per gallon from the partnerships for their use of plaintiff's exclusive rights to bottle and sell Coca-Cola.

As the imposition of the personal holding company tax is automatic upon qualification under the objective criteria of sections 541 et seq., and since imposition of the personal holding company tax does not turn on a tax avoidance motive,[11] "[t]he cases illustrate that many shareholders of closely held corporations, as well as their accountants and lawyers do not realize that the corporation may fall within the personal holding company class." Surrey & Warren at 390. Another commentator noted: "The risk of accidental exposure [to a personal holding company classification] was increased by the 1964 changes. As a consequence, these provisions are of wider interest than many attorneys and accountants realize." Bittker and Eustice, *Federal Income Taxation of Corporations and Shareholders* (3d ed.), p. 8–37.[12]

We must strictly construe the personal holding company sections. *Darrow v. Commissioner*, 64 T.C. 217 (1975); *Cedarburg Canning Co. v. Commissioner*, 149 F.2d 526 (7th Cir. 1945). Because Congress established objective criteria for levying the personal holding company tax, it is improper for us to examine the motives of the

**9.** *See* Committee on Ways and Means, 73d Cong., 2d Sess., H.Rep.No.704, p. 12.

**10.** Compare this with the accumulated earnings tax of sections 531 et seq.

**11.** *See Kurt Frings Agency, Inc. v. Commissioner*, 42 T.C. 472 (1964), *aff'd per curiam*, 351 F.2d 951 (9th Cir. 1965).

**12.** For commentary on this subject, published during the years in issue, *see, e. g.*, Lubin, Personal Holding Companies and the Revenue Act of 1964, 63 Mich.L.Rev. 421 (1965); Shapiro, Personal Holding Companies Under the 1964 Revenue Act, 1965 So.Cal.Tax Inst. 187; and Lubick, Personal Holding Companies—Yesterday, Today and Tomorrow, 42 Taxes 855 (1964).

plaintiff—we must determine whether the objective tests have been satisfied and if they have, impose the personal holding company tax. *O'Sullivan Rubber Co. v. Commissioner,* 120 F.2d 845 (2d Cir. 1941); *Commissioner v. Affiliated Enterprises, Inc.,* 123 F.2d 665 (10th Cir. 1941). This may result in the personal holding company sections reaching corporations which have "accidentally" become personal holding companies. But as the court in *American Package Corp. v. Commissioner,* 125 F.2d 413 (4th Cir. 1942), stated:

> * * * It is, however, abundantly clear that Congress, in correcting an evil, is not narrowly confined to the specific instances which suggested the remedy. "Of course, all personal holding companies were not conceived in sin—many were organized for legitimate personal or business reasons; but Congress has made little distinction between the goats and the sheep." * * * [125 F.2d at 417.]

Therefore, even an operating company must be classified as a personal holding company if it meets the objective personal holding company criteria.

Plaintiff was planned and organized with only two shareholders. Thus, section 542(a)(2) is satisfied. Plaintiff was also planned into a wholly passive enterprise: it engages in no active bottling operation itself, relying instead on passive income as described *supra.* The only element which could prevent plaintiff's classification as a personal holding company lies in a finding of insufficient royalty income for purposes of the 10 percent test of the second sentence of section 543(a)(6). This, in turn, depends upon whether or not plaintiff received any payments for the use of its exclusive Coca-Cola franchise. If plaintiff has been accidentally planned into a personal holding company classification, we, unfortunately, cannot impose a judicial alteration.[13]

The trial judge found that plaintiff intended no part of the 20 cents gallonage payment factor to be a payment for the use by the partnerships of plaintiff's franchise. Based on this lack of intent, the trial judge held that there was no franchise payment. We believe this reliance on plaintiff's intent is erroneous.

■ The determination of the amount of payment for the use of plaintiff's franchise is a difficult matter, compounded by the fact we are dealing with a family-controlled, closely held corporation which was also controlled by the parties with which it contracted.[14] In tax matters, the operations of a family-controlled corporation warrant our careful scrutiny. *E. g., Petro-Chem Marketing Co. v. United States,* 602 F.2d 959, 221 Ct.Cl. —— (1979); *Baird v. Commissioner,* 25 T.C. 387, 393 (1955).

Plaintiff certainly may choose to organize its business affairs in order to minimize its tax burden. *Commissioner v. Tower,* 327 U.S. 280, 288, 66 S.Ct. 532, 536, 90 L.Ed. 670 (1946). But once having chosen, it must accept all the tax consequences of its choice. *Higgins v. Smith,* 308 U.S. 473, 477, 60 S.Ct. 355, 357, 84 L.Ed. 406 (1940); *Television Industries, Inc. v. Commissioner,* 284 F.2d 322, 325 (2d Cir. 1960). When the plaintiff realizes that the effects of his business arrangement also entail unanticipated tax consequences, the plaintiff may not then assert that the substance of the arrangement is not what the objective indicia disclose. *See Gray v. Powell,* 314 U.S. 402, 414, 62 S.Ct. 326, 333, 86 L.Ed. 301 (1961).

These parties are all related and the plaintiff and the partnerships had no adverse economic interests. The sub-bottler's agreements were therefore not the result of an arm's-length transaction. We can find no reason why this plaintiff should not be bound by the well-accepted requirement of proof of the independent economic reality of an arrangement between parties not

---

**13.** Plaintiff, of course, may take advantage of a distribution under section 547 to alleviate some of the harshness resulting from a personal holding company classification.

**14.** The only shareholders of plaintiff are two trusts, beneficiaries of which plus the two trusts themselves are the sole partners of the relevant partnerships with whom plaintiff contracted. *See* note 2, *supra.*

dealing at arm's length. *See E. I. du Pont de Nemours and Co. v. United States, supra; Copperhead Coal Co. v. Commissioner,* 272 F.2d 45 (6th Cir. 1959); *U. S. Mineral Products Co. v. Commissioner,* 52 T.C. 177 (1969); *Baird v. Commissioner, supra; Meyer v. Commissioner,* 45 B.T.A. 228 (1941).

■ Where, as here, the plaintiff is controlled by the other parties to the transaction the correct method of determination of the amount paid for the franchise, for tax purposes, requires a showing that the arrangement is fair and reasonable, judged by the standards of the transaction if entered into by parties dealing at arm's length. *U. S. Mineral Products Co. v. Commissioner, supra; Baird v. Commissioner, supra.* That is, economic realities must control.

Furthermore, the trial judge's ruling is in error on this point because his key finding—that the 20 cent gallonage payment was intended solely to compensate plaintiff for the partnerships' use of the tangible assets—is based on the testimony of the parties' accountant as to their subjective intent.

This subjective intent testimony is in conflict with objective documentary evidence of the plaintiff's business operation:[15] contemporaneous correspondence, leases, agreements, records and reports, etc. The trial judge dismisses the probative value of these documents but, as we explained above, with documentary evidence the trial judge is in no special position to rule on the probative value of the documents; as such, we are less restrained by the presumption regarding the trial judge's findings. *See Morris v. United States, supra.*

A review of the documentary evidence in issue is in order. For the years 1958 through 1969, the financial reports prepared by Ernst & Ernst for plaintiff (and for the Montgomery and Andalusia partnerships), and certified by that firm as accurate, contained a note which, for the entire 11 years, stated in pertinent part:[16]

15. We find the evidence clearly supports the fact findings requested by the defendant in its requested findings 13 through 19 to the trial judge. For brevity, we have eliminated some of the requests but we list here some of the material requests not discussed above:

"15. The contemporaneous acts of the taxpayer confirm that 20 cents per gallon was payment for franchise rights, in that—

\* \* \* \* \* \*

"(b) The minutes of the board of directors, dated October 1, 1958, treats the term sub-bottler's contract separately from the lease agreement, indicating that the franchise rent was separate.

"(c) The minutes of the board of directors, dated December 2, 1958, discusses 'rental paid \* \* \* for the use of their automobiles, delivery equipment, coin rental coolers, pre-mix equipment, including tanks' and the 'new rental basis being 130% of the aggregate annual depreciation deduction' without mention of the gallonage payment. This shows that the taxpayer intended to charge only that amount for its equipment and that no part of the gallonage payment was intended to apply to those types of tangible equipment.

\* \* \* \* \* \*

"(e) Included in the minute book were certain financial statements, including a Schedule of Rental Income, Montgomery Coca-Cola Bottling Company, Incorporated, from October 1, 1959, through September 30, 1960, breaking down the rent into the various tangible asset classifications and showing as a separate item the 'Franchise-Rent (Gallonage).'

"(f) Included in the minute book was a 'Budget—1964–1965 Fiscal Year' in which 'Anticipated.Income' showed the rent for each of the tangible asset classifications separately from 'Rent-franchise.'

\* \* \* \* \* \*

"17. During all of the years in issue, the books and records of the taxpayer confirm that the 20 cents per gallon was the payment for the franchise, in that—

"(a) The chart of accounts segregates the various types of rental income. A separate account is listed for each of the various types of tangible asset rent and a separate account for the royalty. The 20 cents payment was shown as 'Rent-Gallonage.'

"(b) The standard journal, which recorded, on a monthly basis, the amount of rent to be received from each of the partnerships, showed the rent on the franchise in a separate entry from the rent on the various tangible assets.

"(c) The general ledger accumulated the rent received from each of the partnerships separately. Separate accounts were kept for the rental income of each of the various tangible asset categories and a separate account was kept for the rent on the franchise."

16. The complete text of the note used for 11 years is as follows:

"EQUIPMENT LEASE AGREEMENT

"As of October 1, 1958, the Company entered into purchase agreements with associated com-

The Company has also contracted with each of the associated companies for the use of a franchise granting each partnership the privilege of bottling and selling Coca-Cola in bottles under the terms of a Sub-Bottler's Contract for a term ending on December 31, 1968, *at an annual amount of $.20 a gallon of Coca-Cola syrup purchased by the partnership during the year.* [Emphasis supplied.]

After the Service's audit of plaintiff had probably begun, resulting in the contested assessments, this note was changed by Mr. Simmons (Simmons), a partner of Ernst & Ernst and plaintiff's tax advisor, to read in pertinent part [17] as follows:

* * * In addition, the partnerships pay an annual amount of $.20 a gallon of Coca-Cola syrup purchased during the year for the use of the properties set forth above *and the franchises granting the privileges of bottling and selling Coca-Cola* in bottles by the associated companies under the terms of a Sub-Bottler's Contract for a term ending on December 31, 1970. [Emphasis supplied.]

Simmons testified the revised note was accurate. Yet even the revised note unambiguously declares that at least part of the 20 cents gallonage payments are payments for the use of plaintiff's franchise. And the notes used for the 11 years before the audit unambiguously declare that the *entire* 20 cents gallonage payments are payments for the use of plaintiff's franchise.

Additional documentary evidence of the plaintiff's intent includes a letter dated November 17, 1958, written by Elmore to The Coca-Cola Company, which describes the 20 cents gallonage payment "as a rental for territory." The minutes of the board of directors, dated September 17, 1958, show the rent for the tangible assets separately from the franchise (gallonage) rent. The minutes of the stockholders, dated January 5, 1960, state specifically that "the franchise rental [is] based on the number of gallons of syrup used in manufacturing the product." During the years in issue, the checks prepared by the partnerships described the

panies whereby certain assets of Coca-Cola Bottling Company (A Partnership), Andalusia, Alabama, and Coca-Cola Bottling Company (A Partnership), Montgomery, Alabama, were purchased by the Company at the associated partnerships' book value. The assets purchased under these agreements were cooler installment contracts, new and used cooler inventories (excluding picnic coolers), factory equipment, pre-mix equipment, automobiles and trucks, and rental cooler equipment. All of the equipment acquired under these purchase agreements, together with land, buildings, and equipment already owned by the Company which are located in Andalusia, Alabama, and Montgomery, Alabama, were leased to the sellers for a period of 10¼ years from October 1, 1958, to December 31, 1968, at an annual rental as specified in the lease agreements.

"The Company has also contracted with each of the associated companies for the use of a franchise granting each partnership the privilege of bottling and selling Coca-Cola in bottles under the terms of a Sub-Bottler's Contract for a term ending on December 31, 1968, at an annual amount of $.20 a gallon of Coca-Cola syrup purchased by the partnership during the year."

The amended note reads as follows:

"EQUIPMENT LEASE AGREEMENT

"As of October 1, 1958, the Company entered into purchase agreements with associated companies whereby certain assets of Coca-Cola Bottling Company (A Partnership), Andalusia, Alabama, and Coca-Cola Bottling Company (A Partnership), Montgomery, Alabama, were purchased by the Company at the associated partnerships' book value. The assets purchased under these agreements were cooler installment contracts, new and used cooler inventories (excluding picnic coolers), factory equipment, pre-mix equipment, automobiles and trucks, and rental cooler equipment. All of the equipment acquired under these purchase agreements, together with land, buildings, and equipment already owned by the Company which were located in Andalusia, Alabama, and Montgomery, Alabama, were leased to the sellers for a period of 10¼ years from October 1, 1958, to December 31, 1968, at an annual rental as specified in the lease agreements. The lease agreements were extended for a period of two years from January 1, 1969, to December 31, 1970, with only minor changes. In addition, the partnerships pay an annual amount of $.20 a gallon of Coca-Cola syrup purchased during the year for the use of the properties set forth above and the franchises granting the privileges of bottling and selling Coca-Cola in bottles by the associated companies under the terms of a Sub-Bottler's Contract for a term ending on December 31, 1970."

**17.** The facts behind the change are discussed in greater detail *infra.*

item being paid. These checks, signed by Charles Brightwell, general manager of all three entities and secretary-treasurer of plaintiff, showed that the entire 20 cents gallonage payment was rent for the franchise. During all the years in issue, the books and records of plaintiff—the general ledger, the chart of accounts, and the standard journal—all maintain a separate account for the rent on the franchise. The books and records of the partnerships also maintain a separate account for the rent on the franchise and indicate the entire 20 cents gallonage payment was the payment for the use of plaintiff's franchise. Additional documentary evidence exists which coincides with the documentary evidence detailed above; namely, the partnerships believed they were paying for the use of plaintiff's franchise, and plaintiff expected to be paid for their use of the franchise, and the full 20 cents gallonage payment was paid for that purpose. All this evidence was before the trial judge, who dismissed the evidence in a footnote [18] as being vague and ambiguous. We cannot agree. We feel this is weighty evidence and discloses an understanding of the parties that the entire 20 cents gallonage payment was for use of the franchise. We empathize with the plight of the plaintiff; We have held that any "rental" paid for the use of the franchise is a royalty as classified in section 543(a)(1) and therefore personal holding company income. 206 Ct.Cl. 864 (1975). Thus, plaintiff argues that it did not intend a payment for the franchise (or intended only 5 cents per gallon).

The trial judge's report on the intention of the parties pivots on the testimony of Simmons. We feel this reliance was excessive and erroneous.

The subjective intent testimony of the plaintiff can only be seriously considered to the extent it is consistent with the objective evidence. *Monfore v. United States,* 214 Ct.Cl. 705, 722 (1977); *cf. Patterson v. United States,* 459 F.2d 487, 198 Ct.Cl. 543 (1972) (where the court found the subjective and objective evidence coincided and stated such subjective evidence should not be ignored "when consistent with other objective facts.").

We also believe that Simmons is "infected with self-interest" and that while his testimony, of course, is admissible it cannot be given the weight accorded it by the trial judge; nor can Simmons' testimony prevail over the inferences unavoidably drawn from the objective documentary evidence discussed above. *See Bordo Products Co. v. United States,* 476 F.2d 1312, 1324, 201 Ct.Cl. 482, 501 (1973). *Cf. Rombach v. United States,* 440 F.2d 1356, 1359, 194 Ct.Cl. 530, 534 (1971).

Simmons has been an accountant with Ernst & Ernst since 1953 and is head of the tax department of the Birmingham office. Ernst & Ernst has represented the plaintiff since 1941 or 1942 and, in all fairness, must bear some responsibility for plaintiff's current struggles with the Commissioner. And we must not close our eyes to the fact that a favorable finding for plaintiff obviates potential difficulties for Ernst & Ernst (an advisor to plaintiff's plan of organization). In light of this, Simmons had an interest in the outcome of this litigation.

Also, in that regard, we are seriously troubled by Simmons' testimony regarding the above-discussed note to the financial report. As the trial judge found, at the time Simmons changed the note the audit of plaintiff's tax affairs had probably already begun; or at the very least, according to evidence produced by defendant, Simmons was on notice that an audit would probably occur.

Simmons testified the change did not result because of tax considerations but, rather, because the note was "wrong." Simmons asserted this coincidental change of a note used for 11 years was the result of a "tightening" of review of such reports by Ernst & Ernst; two partners are now required to pass on the validity of such reports—the responsibility no longer rests with an audit manager. We, however, cannot avoid the observation that Simmons

18. Finding 22, note 26.

was the *second* partner to review plaintiff's reports. The first partner—one with responsibility for audits—passed on the validity of the report; Simmons then, as the second reviewing partner, found the "error." Though we admit Simmons was probably more familiar with the affairs of plaintiff, we cannot dismiss as irrelevant the fact that Simmons' specialty is taxation; [19] he is the head of the tax department and he is a tax advisor for the parties.

This situation is analogous to one which was before the Supreme Court in *United States v. Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1947). In that case, which involved an asserted violation of the Sherman Act, the Government relied heavily on documentary exhibits and called as witnesses many of the authors of those documents. On cross-examination most of the witnesses denied they had acted in concert or that they had agreed to do the things which in fact were done. The trial court ruled the evidence failed to establish a plan to stabilize prices. The Supreme Court reversed the finding of the trial judge—in spite of the fact the trial judge had the opportunity to observe and appraise the credibility of the witnesses.[20] The court held:

> * * * [w]here such testimony is in conflict with contemporaneous documents we can give it little weight, particularly when the crucial issues involve mixed questions of law and fact. Despite the opportunity of the trial court to appraise the credibility of the witnesses, we cannot under the circumstances of this case rule otherwise than that Finding 118 is clearly erroneous. [333 U.S. at 396, 68 S.Ct. at 542.]

Reviewing Simmons' testimony in light of the standards of *Monfore* and *Bordo Products* and *Gypsum Co.,* we hold that plaintiff cannot establish by Simmons' testimony that the parties did not intend to pay for the franchise or that, in fact, a payment

under the "break point" was made. We must decide whether plaintiff can otherwise carry its burden.

The trial judge comments that his decision "does not depart drastically from what the defendant terms 'the economic facts existing at the time' the leases were drawn." This comment is assumedly based on the testimony of plaintiff's expert witnesses: Messrs. Haas, Battle, and Peters (Haas, Battle, and Peters), all of whom testified there was no value or little value to the Coca-Cola franchise. Haas testified the value of a franchise is entirely dependent upon the ability of the management of the entity utilizing the franchises in bottling operations. Battle said a Coca-Cola franchise, per se, had no value, absent other necessary elements such as management, goodwill, and going concern value. The trial judge was satisfied with this analysis. But the trial judge's analysis is flawed by his failure to adequately apprehend the problems caused by the taxpayer and the affiliated partnerships being controlled by a common family unit.

Because of the trial judge's misapprehension of the demonstration required by a taxpayer such as plaintiff, the trial judge erroneously looked primarily to the plaintiff's intention. As a result of this overriding concern with the plaintiff's intention, the trial judge failed to make the necessary economic analysis. This is clearly seen in finding 37(d), in which the trial judge specifically declines to resolve the differences between the experts on the franchise value and determine what, economically, a fair payment would be for the franchise. As such, the assertion by the trial judge that a finding of no payment for the franchise "does not depart drastically from [the economic facts in this case]" can carry no weight nor any presumption of correctness.

We find that a zero valuation of the franchise is erroneous on the ground that the February 28, 1975, order of this court,

---

**19.** On cross examination Simmons testified he was infrequently involved with auditing matters.

**20.** We note the Supreme Court's reversal of the trial judge's finding of fact occurred under the "clearly erroneous" standard of review—a higher standard than we must deal with.

206 Ct.Cl. 864, 866, held that there was some payment for the franchise right. Therefore, our economic analysis need only consider plaintiff's alternative argument: only 5 cents per gallon was paid for the franchise.[21]

The parties used different methods to determine the arm's-length value of the franchise.[22] Plaintiff's experts used the "subtraction" or "residual" method. Essentially, this method involved an estimation of the fair rental value of the land and buildings and other tangible assets of only the corporate entity. This estimated fair rental value was then subtracted from the actual "rental" payments received by plaintiff (including the gallonage payments). The excess was attributed to payments for the use of the franchise and was divided by the number of gallons of syrup sold during the years in issue. The resulting payment for the franchise was found to be 4 cents per gallon by one expert and 5 cents per gallon by the other.

Accordingly, under plaintiff's analysis the payments received were under the "break point" and plaintiff is not a personal holding company.

Plaintiff asserts that this "residual" method has been approved for valuation purposes in *Jack Daniel Distillery v. United States*, 379 F.2d 569, 180 Ct.Cl. 308 (1967). *Jack Daniel Distillery* did not, however, constitute our acquiescence to the use of the residual method in all instances. Instead, the court stated that the residual method "lacked precision for use in all cases." 379 F.2d at 579, 180 Ct.Cl. at 325. Under *Jack Daniel Distillery*, the residual method is only proper where the minuend and subtrahend are firmly established. The court in *Jack Daniel Distillery* specifically found that the value of the tangible assets and the value of the business was firmly established; further, the court found the parties had in good faith actually employed the residual method.

The facts before us do not allow a similar conclusion. The nonarm's-length nature of the operation is again at the root of the problem. The amount of the rent to be paid by the partnerships was fixed by the family unit. The rent paid by the partnerships reduces their tax liability and profits, and the rent received by the plaintiff increases its profits and tax liability. As

---

**21.** We note at this point that *Coca-Cola Bottling Works of Pittsburgh v. Commissioner*, 19 B.T.A. 267 (1930) (and the cases thereunder, e. g., *Canton Cotton Mills v. Commissioner*, 26 B.T.A. 331 (1932)), is of little assistance to us when considered in the context of that court's holding. Plaintiff relies on the case for the proposition that we must ignore the franchise as an income-producing asset and look instead to management and the business methods employed. *Coca-Cola Bottling Works of Pittsburgh* dealt with the year 1920 and sections 326, 327, and 328 of the Revenue Act of 1918. The court was attempting to determine if the taxpayer's franchise was the chief income-producing asset so as to create an "abnormality" under section 327 warranting the tax to be computed under the relief provision of section 328. The court found that although the franchise did have a value, for purposes other than section 326, the exclusion of the franchise from "invested capital" (as defined in section 326) did not create an abnormality warranting relief to taxpayer under section 328. In short, the court held the franchise was not the *principal* factor in the production of income. We will not extend the scope of the case beyond that point. Also, in reaching its holding the court placed emphasis on the fact that the taxpayer's

franchise was only for two years plus the fact the taxpayer had suffered losses in past years which the taxpayer attributed to bad management.

We note further that "invested capital" was a term of art and was "not based upon the present net worth of the assets as shown by an appraisal or in any other manner." Article 831, Treas.Reg. 45 (Revenue Act of 1918). And the value of the franchise "must be determined *in light of the facts in each case.*" Article 851, Treas.Reg. 45 (Revenue Act of 1918). [Emphasis supplied.]

Finally, it must be recognized that much has changed in the operations of American business since 1920. For example, franchised operations are now very successful and national television advertising, a franchise benefit which our plaintiff has, was not available in 1920 but is now extremely important in the effective marketing of a product.

**22.** It would unduly encumber this opinion to recite all the elements of each party's method of valuation and the various objections thereto. Certain elements do, however, warrant specific discussion, although they were not our sole criteria.

such, we may not assume that the "actual 'rent' received" factor in the plaintiff's formula accurately reflects the correct sum of the fair rental values of all the assets leased. In fact, testimony from both parties indicates that the total rent called for in the leases and sub-bottler's contracts was not sufficient to cover the fair rental value of both the tangible and intangible assets leased. This results in a distortion of the "remainder" and since the asset chosen to be the remainder becomes influenced by the resulting distortion, no realistic valuation can be expected. Therefore, in our judgment, the residual method lacks sufficient precision to be relied upon here. *See R. M. Smith, Inc. v. Commissioner*, 69 T.C. 317, 322 (1977).

Defendant's expert recognized the potential distortion caused by the manner in which the family unit organized its bottling operation. Plaintiff, operating only as a passive leasing corporation with related bottling and selling partnerships, is a unique form of operation in the Coca-Cola industry; and we feel defendant's apportionment method of valuation of the franchise, emphasizing both the "net worth" and the "earnings" approach, presents the most realistic valuation in this situation.

Defendant's method involved an independent determination of the fair rental value of the tangible assets and the fair rental value of the franchise and thus prevented the distortion found in the plaintiff's method. Essentially, defendant's method was as follows: (1) the fair market value of the leased tangible assets was determined; (2) the fair rental value of these leased assets was then calculated using the above-determined fair market value, the original cost of the assets, rates of return and costs of money existing in the economy during the relevant years, and recapture rates based on the useful lives of the assets; (3) the fair market value of the three family-owned entities was determined; (4) the fair market value of the tangible assets was deducted from the fair market value of the total business; the result consisted of the fair market value attributable to the franchise; (5) the fair royalty value of the franchise

was then determined based on the rates of return derived from sales of franchise rights; and (6) because the total "arm's-length" payments described above exceeded the actual payments received by the plaintiff, the fair rental value of the tangible assets and the fair royalty value of the franchise rights were apportioned to the total income received by the plaintiff. The apportionment was based on the ratio existing between the fair rental value and the fair royalty value. Under this method, the full 20-cent gallonage payment is attributable to the franchise.

Plaintiff objects to defendant's method of including the fixed assets appearing on the balance sheets of the affiliated partnerships and the consolidated net working capital adjustment (i. e., current assets minus current liabilities minus long-term debt) of all three entities in the "value of the business" factor. However, plaintiff's operation is controlled by the same family unit. The family unit looks to the returns from all three entities in its operation; the returns actually received by the corporation do not accurately reflect the fair rental value of all assets, including the franchise. Accordingly, we agree with defendant and feel that under the present circumstances the value of the franchise is reflected partially in the profits of the leasing corporation (plaintiff) and partially in the profits of the affiliated partnerships. As a consequence, all three entities should be examined in determining the fair royalty value of the franchise.

Therefore, we agree that, as defendant contends, in an arm's-length transaction the reasonable payment for the franchise would be 20 cents per gallon and that plaintiff's assertions from an economic perspective are unreasonable.

Plaintiff's Coca-Cola franchise was transferable and was of an exclusive nature—possessed by no competitor in plaintiff's territory. Plaintiff's franchise is the *sine qua non* of any person wishing to bottle and sell Coca-Cola in plaintiff's territory. Clearly, without this asset the partnerships

could not bottle and sell Coca-Cola nor take advantage of the benefits accruing from association with a highly popular product and successfully managed national operation providing national advertising and other marketing aids.

Other courts have determined that a Coca-Cola franchise is a valuable asset. *Hugh Smith, Inc. v. Commissioner,* 8 T.C. 660 (1947), *aff'd per curiam,* 173 F.2d 224 (6th Cir. 1949), *cert. denied,* 337 U.S. 918, 69 S.Ct. 1161, 93 L.Ed. 1728 (1949); *Coca-Cola Bottling Co. of Sacramento v. Commissioner,* 17 T.C. 101 (1951), supplemental opinion, 19 T.C. 282 (1952), *aff'd on other grounds sub nom. Sellers v. Commissioner,* 218 F.2d 380 (9th Cir. 1955). *See Sumter Coca-Cola v. Commissioner,* 7 B.T.A. 890 (1927), for a discussion of how franchises were originally given away as inducements to sell the product but after the drink became popular, the franchises were recognized as a valuable asset and sold.

The unreasonableness of plaintiff's position is further accentuated by the testimony of experts, from both parties, showing that royalties in other sub-bottler's contracts ranged from 5 cents to 30 cents per gallon. Plaintiff's expert narrowed this range to 10 to 20 cents and the Government's expert, a man with extensive experience in Coca-Cola operations in the southeastern part of the United States, testified the majority of the contracts located in the southeastern United States were in the 15 to 25 cents range. This latter figure is consistent with an exhibit of plaintiff's, a "memorandum of proposed plans of reorganization of Bellingrath interests." This memorandum was attached to a letter sent by Ernst & Ernst to Elmore which states the "customary rate is $.25 a gallon."

Plaintiff has purchased other bottling operations in the past. It allocated little or no value to the franchises of those operations, and these transactions were audited without objection by a field agent of the Service. Plaintiff argues such past history is sufficient proof of lack of franchise value. We do not agree. Plaintiff's franchise has an indefinite useful life and is therefore not

depreciable. Treas.Reg. § 1.167(a)–3. And it is natural for a taxpayer to attempt to obtain the greatest possible tax advantage in such a situation. Plaintiff, then, would be expected to attach as little value as possible to the franchise. Further, we do not attach to the agent's review of the purchases the finality that plaintiff does. Defendant correctly points out that a failure of the Service to require adjustments to plaintiff's allocation does not necessarily indicate an approval of the allocation of values. Adjustments may not be proposed for a number of reasons; there may have been problems with access to probative information or other outside factors affecting the judgment of the particular agent involved. The Service is not unmindful of this situation and as a result, if certain criteria are met, may reopen any case previously closed so as to make adjustments unfavorable to the taxpayer. Treas.Reg. § 601.105(j). This policy has received judicial approval. *Freeland v. Commissioner,* 393 F.2d 573 (9th Cir. 1968), *cert. denied,* 393 U.S. 845, 89 S.Ct. 132, 21 L.Ed.2d 117, *rehearing denied,* 393 U.S. 956, 89 S.Ct. 373, 21 L.Ed.2d 369 (1968); *Council of British Societies in Southern California v. United States,* 42 AFTR 2d 78–6014 (C.D.Cal.1978); *Trippeer v. United States,* 20 AFTR 2d 67–5076 (W.D.Tenn.1976).

We also note that there are other factors militating against attachment of much weight to plaintiff's treatment of the purchased franchises. For example, the Alexander City franchise was acquired by a purchase of the stock, and not the underlying assets, of the Alexander City Coca-Cola Bottling Company.

Plaintiff finally argues that it should prevail because the Government's method of valuation of the enterprise assigns no value to intangibles such as goodwill and is, therefore, erroneous. We do not feel defendant's position on this issue is erroneous nor do we feel plaintiff has demonstrated that it is. Defendant's expert has testified that there is no goodwill in a Coca-Cola bottling operation. Anything resembling goodwill attaches solely to the national company and

the name of the product [23] (the use of which the partnerships obtain via plaintiff's franchise). Customers buy Coca-Cola because of a desire for the product, not because of who bottles it. Since goodwill is considered to be the value of the habit of customers to return to purchase a product at the same location, the absence of the product would destroy the value of the habit; and since only one entity has the perpetual right to distribute Coca-Cola in a territory, the value of goodwill, and the franchise are so interrelated as to be indistinguishable, all the value should then be assigned to the franchise. Also, the Tax Court has ruled that in a monopoly situation since the potential customers have no alternative but to go to the possessor of the right, there may be no goodwill in the traditional sense and that such monopoly actually enhances the value of the other intangibles. *Pensacola Greyhound Racing, Inc. v. Commissioner*, 32 T.C.M. (CCH) 225 (1973) (dealing with a racing permit, racing license, and liquor license).

As we stated at the outset of our analysis, we are obliged to determine if plaintiff has carried its burden, and we must scrutinize the arrangements of family-controlled transactions, and strictly construe the personal holding company sections. The no-narm's-length arrangement as presented in the instant case must be shown to be fair and reasonable when judged by economic standards. In this regard, plaintiff has not demonstrated that the defendant's assessment was either erroneous or arbitrary; we find the defendant's valuation was both fair and reasonable. Accordingly, based on the objective documentary evidence and the economic analysis, the Government's assessment must prevail.

The trial judge erred in disregarding the objective documentary evidence favoring the Government; he erred in relying so heavily on the testimony of Simmons; he erred in basing the case on the subjective intent of the parties; and he erred in failing to effectively analyze the economic aspects of the transaction.

### CONCLUSION OF LAW

We conclude the entire 20 cents gallonage payment factor was a royalty payment for the use of plaintiff's Coca-Cola franchise. Plaintiff, therefore, was correctly assessed as a personal holding company. Accordingly, plaintiff is not allowed to recover and the petition is dismissed.

DAVIS, Judge, dissenting:

In my opinion this case turns wholly on the factual issue of whether the parties to the 1958 agreements intended the 20-cent gallonage fee to be, on the one hand, payment for the Coca-Cola franchise or, on the other hand, an additional payment for the use of the tangible real and personal property. Unlike the court, I consider the parties' intention in 1958 to be crucial because I think that they could legitimately decide (especially in view of the position, testified to by plaintiffs' experts and accepted by the trial judge, that the franchise had no fixed or measurable value for plaintiff) to have the bottling partnerships shoulder all the cost of the franchise, whatever that may have been, without reimbursing plaintiff for it. That is precisely what happened in plaintiff's relationship with the partnerships in all the years between 1934 and October 1, 1958, when the 1958 agreement (involved in the present case) went into effect. Nothing in the personal holding company provisions demanded that plaintiff must necessarily receive royalty payments (assuming that the franchise had a substantial value) if it did not wish to receive them and the partnerships did not wish to pay them. Without transgressing those statutory provisions taxpayer could properly mold its arrangements so that it did not obtain any such royalty payments. The basic issue is whether it did so in fact. Of course, we

---

**23.** In considering a trademark and trade name infringement suit, the Eighth Circuit said:

"* * * [Coca-Cola] * * * means a single thing coming from a single source, and well known to the community. It hardly would

be too much to say that the drink characterizes the name as much as the name the drink. * * *" [*Cleo Syrup Corp. v. Coca-Cola Co.*, 139 F.2d 416, 417 (8th Cir. 1943).]

are not bound by plaintiff's own statements of intention if the facts and circumstances of the arrangements show that those representations are inaccurate and cannot be accepted at face value. But the essential question still remains one of the parties' own intention.[1] The basic question is *not* whether, objectively, the franchise had value (and if so how much).

After holding a lengthy trial and hearing witnesses, Trial Judge Wood, the trier of fact, determined that "[t]he preponderance of the credible evidence in the record as a whole is that the 20 cents per gallon surcharge payment factor included in the term sub-bottler's contracts in effect between plaintiff and the two partnerships throughout the tax years here involved, and incorporated by reference in the lease agreements in effect between plaintiff and the partnerships throughout that same period, was intended solely as a partial payment to plaintiff for the use of plaintiff's tangible assets by the respective partnerships, not as a payment to plaintiff for the use by the respective partnerships of plaintiff's franchise." Trial Judge's Opinion at 20. We are not bound by that finding if we are convinced or feel strongly that it is erroneous, but, again unlike the court, I am not so convinced nor do I feel strongly that it is wrong (though I do find the issue in close balance). Accordingly, I have to accept the trial judge's determination. *See Davis v. United States*, 164 Ct.Cl. 612, 616–17 (1964).

The major factors which induced the trial judge to find as he did, and which lead me to consider his position reasonable and supportable, are these:

(*a*). Concededly, from 1934 to 1955 taxpayer received no payment from the partnerships to which it transferred both its franchise and the right to use tangible assets (owned by plaintiff) for the transfer of the franchise.

(*b*). Similarly, the 1956 contracts with the partnerships did not, either by their terms or under the testimony credited by the trial judge, call for any franchise, surcharge, or markup payment by the partnerships to plaintiff.

(*c*). As for the 1958 agreement, there was evidence, credited by the trial judge, that the parties to the arrangement reasonably believed that plaintiff needed more money for its tangible assets, that the aggregate of the amounts theretofore payable by the partnerships for the tangible assets was too low to compensate plaintiff for the use of those assets, and that the 20 cents per gallon payment factor was intended to supplement, and to take up the slack in, these otherwise inadequate rental payments.

(*d*). There was testimony, credited by the trial judge, that the 20 cent gallonage fee was incorporated into the 1958 *contracts* (not solely into the leases) only at the insistence of the Coca-Cola Company (not the plaintiff, but the principal over-all Coca-Cola firm).

(*e*). The trial judge credited the testimony of plaintiff's three expert witnesses[2] that the Coca-Cola franchise, in and of itself, was not an asset of any fixed or measurable value to plaintiff. In his opinion, the trial judge said:

Further, expert testimony at trial strongly suggests that plaintiff's franchise, in and of itself, was not an asset of any fixed or measurable value, and tends to validate plaintiff's historical treatment of that franchise. One credible and im-

---

1. This is the basis on which the case was tried. The trial judge's opinion states (pp. 24–25): "Defendant does not contend that plaintiff and the two partnerships could not validly agree to a 20 cents per gallon surcharge payment factor as a partial payment for the use of tangible assets, rather than as a payment (in whole or in part) for the right to use plaintiff's franchise. Nor does defendant contend that, if the parties actually did reach such an agreement, tax consequences ad-

verse to plaintiff would follow. Defendant's position is, rather, that the entire 20 cents per gallon surcharge payment factor was in fact intended to be, and was, a royalty (or rental) payment for the use of plaintiff's franchise."

2. The trial judge expressly found that each of these witnesses was a qualified, experienced expert, and was "credible" and "impressive."

pressive expert, with wide experience in the evaluation of soft drink bottling enterprises for purposes of mergers and acquisitions, testified that the value of a franchise was entirely dependent upon the ability of the management of the entity utilizing the franchise in bottling operations; another expert highly qualified in the evaluation of Coca-Cola bottling companies was of the opinion that a Coca-Cola franchise, *per se*, had no value, absent other necessary elements such as management, goodwill, and going concern value; and the third, also highly qualified in the evaluation of Coca-Cola bottling companies, testified that, in evaluating plaintiff alone, he found no value whatever to the franchise. As this witness put it, during the tax years here relevant the franchise, "separate and apart", was "valueless" to plaintiff.

I am unable to say that the trial judge could not or should not view this testimony as reasonable, or that although it was reasonable he could not or should not take it into account in appraising the intention of the parties to the 1958 agreement—the basic issue in the case.

(*f*). The trial judge accepted as credible the testimony of Mr. Simmons (which the court here rejects) explaining the footnotes in the Ernst & Ernst reports which the court quotes in its footnote 16, and also giving the intent underlying the 1956 and 1958 arrangements.[3]

(*g*). As for the statements which the court's opinion refers to and quotes in its footnote 15, the trial judge thought these statements to be vague and ambiguous labels or descriptions which, when viewed in context and in light of the whole record (including Mr. Simmons' testimony), fail to rebut the clear and convincing proof of a quite different substantive transaction.

There are, of course, contrary aspects of the case which the court marshals in support of its position, but for me, as a reviewing judge, these other elements do not sufficiently swing the balance against the trial judge's determination. For one thing the court much overstresses its view of the objective value of the franchise and seems to assume throughout its opinion that because in its view the franchise had substantial value, the 1958 agreements necessarily had to provide for royalty payments. As I have emphasized, that seems to me to misstate and avoid the essential issue in the case—the intent of the parties (see text and note 1, *supra*).[4] Moreover, I cannot accept the court's discrediting of plaintiff's witnesses whom the trial judge expressly accepted, and the court's acceptance of the testimony of defendant's witnesses the trial judge refused to credit. Under our Rules and consistent practice, this careful trial judge's conclusions as to credibility deserve very great weight.

Finally, I note that, even if the trial judge's determination is rejected, there is no finding that the presumed royalty payments exceeded the "break even" point necessary to make plaintiff a personal holding company, and it cannot be said, without considerable further delving into the record and the facts, that on that point defendant's expert should be accepted without question.[5] Even if the trial judge is wrong,

**3.** The trial judge said of Mr. Simmons: He "was candid, knowledgeable, and articulate, and his demeanor while testifying was most impressive. He, was, in short, a highly persuasive and credible witness." The trial judge explicitly rejected defendant's charge that Mr. Simmons was very much concerned that the taxpayer prevail in this case (a charge which the court seems to accept today).

**4.** I do not read the court's order in 206 Ct.Cl. 864, 866 (1975), as necessarily imposing a floor of 5 cents per gallon as the royalty for the franchise or as preventing the trial judge from finding, after trial, that in fact no royalty at all was paid. I understand the court's orders to

leave the entire question of what, if any, part of the 20¢ gallonage fee was a royalty to the trial judge. The reference to "five cents per gallon or twenty cents per gallon" seems to me merely illustrative of the issue to be decided as the court saw it on the basis of the parties' then presentation.

**5.** The trial judge found in his finding 37(d) that "none of the evaluation witnesses for either side was wholly free from error, of greater or lesser degrees of seriousness, in his opinions, calculations, and testimony, and that not all of such witnesses were equally credible, impressive, and persuasive."

the case should be remanded for the further determination he found it unnecessary and burdensome to make. The court's short-form discussion of the point is not an adequate substitute for the painstaking analysis which should be made by the trial judge who heard the witnesses.